IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| PAUL W. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No.: _____ |
| | ) | Judge: _____ |
| v. | ) | |
| | ) | |
| KNOX COUNTY, TENNESSEE, | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, PAUL W. WHITE, by and through counsel, and sues the Defendant, and for cause of action would show unto the Honorable Court as follows:

1. Plaintiff, Paul W. White, is a citizen and resident of Knox County, Knoxville, Tennessee.

2. Defendant, Knox County, Tennessee, is a political subdivision of the State of Tennessee and may be served with process by and through the County Mayor, Glenn Jacobs, at the City County Building, 400 Main Street, Suite 615, Knoxville, TN 37902, or the Knox County Law Director, David L. Buuck, at the City County Building, 400 Main Street, Suite 612, Knoxville, TN 37902.

3. Jurisdiction is founded upon Federal Question, 28 U.S.C. § 1331, arising under 42 U.S.C. § 1983, and the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367.

4. Venue is proper under the code provisions cited herein, as well as the general venue provisions of 28 U.S.C. § 1391.

5. At all times material hereto, Defendant was subject to the provisions of 42 U.S.C.

§ 1983.

6. At all times material hereto, Defendant was an employer subject to the provisions of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

7. At all times material hereto, Mayor Glenn Jacobs was a public official under Tennessee law elected by the citizens of Knox County, Tennessee.

8. At all times material hereto, Defendant was a "public employer" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

9. At all times material hereto, Mayor Jacobs was an "elected public official" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

10. At all times material hereto, Defendant was an employer engaging in an industry affecting commerce, and employed more than five hundred (500) employees in the State of Tennessee.

11. At all times material hereto, Mayor Jacobs was an agent and employee of Defendant.

12. At all times material hereto, Mayor Jacobs had final policy-making authority over Defendant.

13. At all times material hereto, Defendant, and its agents and employees were considered "public servants" within the meaning of Tennessee Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq*.

14. As set forth herein, during his employment, the Plaintiff engaged in and intended to continue to engage in constitutionally and legally protected activity by speaking or engaging in speech activity on matters of great public concern and by reporting, opposing, and refusing to

remain silent about or participate in the illegal activities of Defendant's high-ranking officials in violation of Tennessee law, including, but not limited to, the following Tennessee statutes, among other laws, regulations, and ordinances, to-wit:

- Official Misconduct, Tenn. Code Ann. § 39-16-402.

- Official Oppression, Tenn. Code Ann. § 39-16-403.

- Advocacy for Honest and Appropriate Government Spending Act, Tenn. Code Ann. § 8-4-401, *et seq*.

- Local Government Instances of Fraud Reporting Act, Tenn. Code Ann. § 8-4-501, *et seq*.

- Misrepresentation in Audits, Tenn. Code Ann. § 39-16-407.

- Theft of Services, Tenn. Code Ann. § 39-14-104.

- False Claims Act, Tenn. Code Ann. §4-18-101, *et seq*.

- Offenses by Supervisors and Employees, Tenn. Code Ann. § 39-16-410.

15. The Tennessee statutes set forth in Paragraph 13-14 were enacted to protect the public health, safety, and welfare.

16. The Tennessee statutes set forth in Paragraphs 13-14 reflect clear and unambiguous statements of public policy.

17. The Tennessee statutes set forth in Paragraphs 13-14 can subject the Defendant, its agents and employees to civil and/or criminal penalties and fines.

18. On September 1, 2018, Plaintiff was hired by Defendant as the "Senior Director" of the Parks and Recreation Department, and Plaintiff remained in this position until his termination, as hereinafter alleged.

19. During his employment, Plaintiff performed his duties in a competent and satisfactory manner.

20. During his employment, Plaintiff was never written-up for any disciplinary reason.

21. At all times material hereto, Plaintiff was qualified for the position of Senior Director of the Parks and Recreation Department.

22. During his employment, the Plaintiff reported to and was supervised by the Chief of Staff, Bryan Hair.

23. At all times material hereto, Bryan Hair was an agent and employee of Defendant.

24. As Chief of Staff, Bryan Hair had the authority to discipline the Plaintiff.

25. As Chief of Staff, Bryan Hair had the authority to terminate the Plaintiff.

26. As Chief of Staff, Bryan Hair had the authority to direct and control the terms and conditions of Plaintiff's employment and job responsibilities.

27. At all times material hereto, since the Chief of Staff, Bryan Hair, was Plaintiff's supervisor, Plaintiff's refusal to follow the directives of Hair could constitute insubordination which could subject Plaintiff to disciplinary action, up to and including termination.

28. As Chief of Staff, Bryan Hair reported to and was supervised by Mayor Jacobs.

29. At all times material hereto, Plaintiff also indirectly reported to Mayor Jacobs, by virtue of Jacobs' role as the Mayor, because, for example, according to Defendant's Charter at Sec. 3.02 – Executive Branch, Mayor Jacobs "shall be the head of the Executive Branch of Knox County Government, responsible for the exercising of all executive and administrative functions of the County Government and shall be the chief fiscal officer of the County."

30. Therefore, at all times material hereto, Mayor Jacobs had the authority to direct and control the terms and conditions of Plaintiff's job responsibilities, including the authority to discipline and terminate Plaintiff.

31. At all times material hereto, Plaintiff's refusal to follow the directives of Mayor Jacobs could constitute insubordination which could subject Plaintiff to disciplinary action, up to

4

and including termination.

32. At all times material hereto, Chuck James was employed by Defendant as the "Director" of the Parks and Recreation Department.

33. Chuck James was originally hired by Defendant in or around 1991 to work in the Parks and Recreation Department, and he continued to work in this Department at all times material hereto.

34. At the time Plaintiff was hired as the "Senior Director" of the Parks and Recreation Department, on September 1, 2018, Chuck James was working as the interim-Director of the Department, and, in turn, James was given the job title of "Director" of Parks and Recreation.

35. As "Director" of the Parks and Recreation Department, Chuck James was supposed to report directly to Plaintiff according to the chain-of-command and the organizational chart but, in reality, James was authorized by senior officials, including, among others, Mayor Jacobs and Chief of Staff, Bryan Hair, to act on behalf of the entire Parks and Recreation Department, and James was considered to also be in charge of the Department.

36. In fact, before and after Plaintiff became the "Senior Director" of Parks and Recreation in 2018, Mayor Jacobs and Bryan Hair both explained to Plaintiff that Chuck James had worked for Defendant for over thirty (30) years and that James would handle the day-to-day operations of the Parks and Recreation Department, while Plaintiff was essentially the figurehead of the Department, on paper, and would handle overseeing the budget and some financing, but as Plaintiff's employment continued, James made it clear that he did not have to listen to Plaintiff or comply with his directions, which further diminished Plaintiff's job responsibilities and duties.

37. As a result, Plaintiff's job description as "Senior" Director of Parks and Recreation did not accurately reflect Plaintiff's actual job responsibilities and duties.

38. At all times material hereto, Mayor Jacobs and Chuck James were close personal friends, which, in turn, allowed James to act with impunity as the "Director" of Parks and Recreation, with the full knowledge and permission of other senior officials, and Mayor Jacobs went to great lengths to protect James at the expense of other employees.

39. For example, at all times material hereto, Chuck James was also compensated more than Plaintiff, despite Plaintiff being the alleged "Senior Director" and "supervisor" of James.

40. At all times material hereto, the Defendant's Charter, Sec. 3.06. – County Departments and Other Entities, provides, in relevant part: "The Department Directors of the County…shall be residents of Knox County at the time they assume the duties of their office and at all other times while serving the County in such capacity."

41. However, at all times material hereto, Chuck James did not live or reside in Knox County, Tennessee, during the time he was "Director" of Parks and Recreation.

42. Therefore, Chuck James could not formally be the "Department Director" over one of Defendant's Departments, such as Parks and Recreation, since James did not live and reside in Knox County, in accordance with Defendant's Charter, Sec. 3.06 – County Departments and Other Entities.

43. As a result, Defendant sought to circumvent the prohibition of the Charter by giving Mayor Jacobs' friend, Chuck James, the title of "Director" of Parks and Recreation with all of the pay, responsibilities, and authority commensurate with one of Defendant's "Department Director" positions, while having Plaintiff hold the title of "Senior Director" on paper, since he resided in Knox County in accordance with Defendant's Charter, but Plaintiff was given less pay and diminished responsibilities and authority.

44. This resulted in a subterfuge, where Plaintiff was the "supervisor" of Chuck James

only on paper, but James was effectively endowed with the authority, power, and compensation of the "Senior Director" position, and he could do what he wanted with impunity in operating the Parks and Recreation Department.

45. By way of further example, despite Plaintiff being the "Senior Director" of the Parks and Recreation Department, Plaintiff was never given a purchase card to make purchases on behalf of Defendant.

46. Rather, Defendant provided the "Director" of Parks and Recreation Department, Chuck James, with a purchase card to make purchases on behalf of Defendant.

47. Mayor Jacobs made the decision and/or was involved in the decision-making process to circumvent Defendant's Charter by giving Chuck James the position of "Director" of the Parks and Recreation Department.

48. Mayor Jacobs made the decision and/or was involved in the decision-making process to compensate Chuck James more than the Plaintiff was compensated.

49. Mayor Jacobs made the decision and/or was involved in the decision-making process to provide Chuck James with one of Defendant's purchase cards.

50. In May 2020, the Plaintiff and Chuck James, on behalf of the Parks and Recreation Department, authorized the legitimate and appropriate purchase of two (2) refurbished golf carts to be used by the Parks and Recreation Department.

51. Shortly thereafter, Chief of Staff, Bryan Hair, requested to "borrow" one of the County's golf carts for his own personal benefit, so that he could keep it at his personal residence, but Plaintiff denied his request explaining that Defendant could not authorize this since, among other concerns, it would constitute a clearly fraudulent misappropriation of County property in violation of Tennessee law.

52. However, the Chief of Staff, Bryan Hair, refused to take "no" for an answer, and he thereafter sought permission from the "Director" of Parks and Recreation, Chuck James, to allow Hair to use of one of the golf carts at his personal residence, and James granted Hair's request and arranged for the golf cart to be delivered to Hair's personal residence using Defendant's property and employees to make this "free" delivery for Hair.

53. Once Plaintiff discovered this illegal arrangement, he attempted to intervene and stop the misappropriation of County property, complained that it was illegal for the Chief of Staff, Bryan Hair, to use the County's property for his own personal use and benefit, and Plaintiff tried on several occasions in 2020 to change Hair's mind and to return the golf cart, but Plaintiff's complaints were to no avail. In fact, Plaintiff's complaints to Hair had the opposite effect, as Hair blatantly threatened Plaintiff that "you will be fired if you tell anyone or try to stop it."

54. By this time, in the summer of 2020, Plaintiff's authority as "Senior Director" of Parks and Recreation had increasingly diminished to the point that he had no authority in controlling the conduct or decision-making of the "Director" of Parks and Recreation, Chuck James, since senior officials, such as Chief of Staff, Bryan Hair, allowed James to effectively usurp Plaintiff's role and authority even further, thereby allowing James to utilize the County's property and employees however he saw fit, including for the personal gain and benefit of himself and other senior officials like Hair.

55. As a result, in mid-July 2020, Plaintiff sought the assistance of Human Resources Director, Marcus Kennedy, by complaining to Kennedy about the Chief of Staff, Bryan Hair, and "Director" of Parks and Recreation, Chuck James, misusing the property and employees of the Parks and Recreation Department for their own personal benefit and gain, and that James was using his role and authority to do favors for officials, like Hair, by performing various illegal

activities, such as, but not limited to, authorizing Hair's illegal use of the County's golf cart, and also having Defendant's employees, while on the clock, perform various chores at the personal residences of various officials, other employees, and/or their friends or family, such as by having employees move a children's playset at Hair's residence.

56. However, Human Resources Director, Marcus Kennedy, failed to stop the illegal conduct and, in fact, Kennedy was dismissive of Plaintiff's complaints, telling Plaintiff that "you need to control him [Hair] and get it under control" to which Plaintiff explained he tried to stop this conduct to no avail since Plaintiff did not have any authority to control the conduct of Hair or Chuck James, which was resulting in the illegal activities within Defendant's government that Plaintiff complained about to Kennedy.

57. In response to Plaintiff's complaints in mid-July 2020, Marcus Kennedy asserted that he "couldn't do anything about it."

58. At all times material hereto, Marcus Kennedy was an agent and employee of Defendant.

59. As Human Resources Director, Marcus Kennedy had the duty and authority to investigate and report complaints of illegal activities, including the misconduct of public officials and employees, such as any misappropriation of public funds, property, and/or employee labor.

60. On September 29, 2020, less than a month before his wrongful termination, as hereinafter alleged, Plaintiff went to Human Resources Director, Marcus Kennedy, to again complain that Chief of Staff, Bryan Hair, and "Director" of Parks and Recreation, Chuck James, were continuing to illegally misappropriate the County's property and employees for their own personal benefit and gain.

61. However, Human Resources Director, Marcus Kennedy, simply refused to conduct

9

any investigation, and, instead, Kennedy was again dismissive of Plaintiff's complaints and he appeared visibly annoyed and frustrated that Plaintiff would continue to raise his concerns of illegal activity—although Kennedy reluctantly "agreed" that Bryan Hair's use of the County's golf cart, property, and employees for his personal benefit was a "problem" and, on at least one occasion before Plaintiff's termination, Kennedy stated he would inform Mayor Jacobs of Plaintiff's complaints of the illegal activities, as herein described, but Kennedy still refused to investigative or take any corrective action to address Plaintiff's complaints.

62. Unbeknownst to Plaintiff, at the time he complained about these illegal activities to Human Resources Director, Marcus Kennedy, in July and September 2020, Kennedy was already well-aware that the Chief of Staff, Bryan Hair, had a golf cart at his personal residence.

63. In fact, in or around September 7, 2020, Bryan Hair even took Marcus Kennedy and his family out for rides on the County's golf cart that was purchased using funds provided by Knox County taxpayers.

64. Mayor Jacobs knew and/or should have known that his Chief of Staff, Bryan Hair, and close friend, Chuck James, as well as others, were utilizing Defendant's property and employees for their own personal benefit and gain at the expense of taxpayers.

65. Prior to Plaintiff's termination, as hereinafter alleged, Mayor Jacobs also engaged in similar conduct as Chief of Staff, Bryan Hair, by misusing County property and employees for his own personal benefit. For example, on June 22, 2020, Mayor Jacobs and Plaintiff spoke regarding Jacobs' wife needing help to remove a snake from outside of the Jacobs' personal residence. Shortly thereafter, once Mayor Jacobs' wife confirmed with Plaintiff that she needed help removing the snake, Plaintiff and two (2) other employees did as they were instructed to do, drove to the Jacobs' personal residence, while on the clock, and spent approximately two (2) hours

10

assisting Mayor Jacobs' wife with the removal of the snake at the Jacobs' personal residence.

66. Thereafter, on information and belief, Mayor Jacobs and/or those acting on his behalf represented to the Tennessee Comptroller that Mayor Jacobs was not aware that employees went to his personal residence to perform this task of removing the snake, while they were still on the clock.

67. However, this was not true or accurate, in fact, Mayor Jacobs texted Plaintiff on June 22, 2020 providing his wife's contact information to Plaintiff and also stating, in part, "If you wouldn't mind calling her" and the Plaintiff did as he was instructed to do by Mayor Jacobs.

68. Misrepresenting information to the Tennessee Comptroller in connection with an audit is in violation of Tennessee law, including but not limited to, Advocacy for Honest and Appropriate Government Spending Act, Tenn. Code Ann. § 8-4-401, *et seq.*, and Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq*.

69. Fraudulently misappropriating and misusing County property for the personal benefit and gain of public officials is in violation of Tennessee law, including Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq.*, Theft of Services, Tenn. Code Ann. § 39-14-104, *et seq.*, as well as the Tennessee False Claims Act, Tenn. Code Ann. §4-18-101, *et seq.*

70. Fraudulently misappropriating and misusing County employees in order to procure free labor for the personal benefit and gain of public officials is in violation of Tennessee law, including Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq.*, Theft of Services, Tenn. Code Ann. § 39-14-104, *et seq.*, as well as the Tennessee False Claims Act, Tenn. Code Ann. §4-18-101, *et seq.*

71. Conduct in violation of the Tennessee Misconduct Involving Public Officials and

Employees, Tenn. Code Ann. § 39-16-401, *et seq.*, including Official Misconduct under Tenn. Code Ann. § 39-16-402, constitutes "illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

72. Conduct in violation of the Tennessee Theft of Services statute, Tenn. Code Ann. § 39-14-104, *et seq.*, constitutes "illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

73. Conduct in violation of the Tennessee Advocacy for Honest and Appropriate Government Spending Act, Tenn. Code Ann. § 8-4-401, *et seq.*, constitutes "illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

74. Conduct in violation of the Tennessee Local Government Instances of Fraud Reporting Act, Tenn. Code Ann. § 8-4-501, *et seq.*, constitutes "illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

75. The Tennessee statutes for Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq.*, Theft of Services, Tenn. Code Ann. § 39-14-104, *et seq.*, Tennessee False Claims Act, Tenn. Code Ann. §4-18-101, *et seq.*, are intended to protect the public's health, safety, and welfare.

76. The anti-retaliation provisions of the Tennessee Advocacy for Honest and Appropriate Government Spending Act, Tenn. Code Ann. § 8-4-409, as well as Tenn. Code Ann. § 8-50-116, are intended to protect the public's health, safety, and welfare.

77. As set forth herein, as Plaintiff became aware of additional instances of Bryan Hair and/or Chuck James utilizing County property and employees for their own personal benefit and gain, Plaintiff confirmed such conduct was in clear violation of Tennessee law.

78. However, since Plaintiff's complaints about the illegal activities to the Human Resources Director, Marcus Kennedy, were continually ignored and dismissed, Plaintiff began to approach Finance Director/Deputy Chief of Staff, Chris Caldwell, to complain and inquire about

12

the implications of Defendant's high-ranking senior officials misappropriating County property, at the expense of taxpayers, such as Bryan Hair's use of the golf cart at his personal residence.

79. But, instead of contacting Finance Director/Deputy Chief of Staff, Chris Caldwell, during work hours, Plaintiff began bringing his concerns to Caldwell outside of work hours to avoid raising suspicions, when they were not on the clock, out of his legitimate concerns as a citizen and taxpayer, due to the fact that Defendant's high-ranking officials were either actively engaging in illegal activities, or, more likely, were aware of the illegal activities and willfully ignoring it, and Plaintiff raised these concerns to Caldwell in this manner on multiple different occasions leading up to Plaintiff's wrongful termination, as hereinafter alleged, including, but not limited to, on July 28, 2020, August 2, 2020, August 15, 2020, and September 10, 2020.

80. During these conversations, Chris Caldwell confirmed Plaintiff's fear that the employees, like Bryan Hair, were blatantly violating Tennessee law, and, in fact, Caldwell stated that Plaintiff was "not the only Director who had these issues with Bryan [Hair]" and Caldwell confirmed that similar complaints were made about Hair attempting to misuse at least one other Department for his own personal gain and benefit.

81. As Plaintiff continued to raise the concerns of illegal activity, as described herein, with Chris Caldwell, on September 10, 2020, Caldwell finally stated that he would address Plaintiff's complaints directly with Mayor Jacobs, but Caldwell warned that, in the past, Mayor Jacobs "just played it off" when Caldwell raised similar concerns to Mayor Jacobs previously.

82. As set forth herein, Plaintiff continued to independently investigate the misappropriation of County property and employees, and he verified that the conduct of Bryan Hair and Chuck James was illegal, criminal, and unethical.

83. At all times material hereto, Plaintiff's job responsibilities as the "Senior" Director

13

of Parks and Recreation did not include off-the-clock communications with high-ranking senior officials, such as Chris Caldwell, about the illegal and unethical activities of Defendant's employees, nor did Plaintiff's job responsibilities include investigating and verifying such illegal and unethical conduct.

84. On September 24, 2020, Chief of Staff, Bryan Hair, called Plaintiff to inform him that a reporter was asking about certain Departments, including Parks and Recreation, purchasing apparel for its employees, but Hair further stated that "it is not a big deal."

85. Shortly thereafter, on September 28, 2020, Plaintiff met with Finance Director/Deputy Chief of Staff, Chris Caldwell, and Communications Director, Mike Donila, regarding the reporter looking into the purchases of boots and apparel for Parks and Recreation employees, but they also confirmed to Plaintiff that "you did nothing wrong" and "it was in your budget."

86. In fact, on October 1, 2020, Communicators Director, Mike Donila, texted the Plaintiff assuring him "don't worry about this sh-t" and "[w]e aren't gonna throw you to the wolves" in regards to the purchases by the Parks and Recreation Department being reviewed by third parties, such as the reporters and also auditors.

87. On October 2, 2020, during a telephone conversation, Mayor Jacobs specifically told Plaintiff "not to worry" about the purchases by the Parks and Recreation Department, and that Plaintiff was "doing a great job" and that "you've saved us a lot of money" in the Parks and Recreation Department amounting to "over 6 figures" for both fiscal years.

88. During this conversation on October 2, 2020, Mayor Jacobs also referred to the "boots investigation" in regards to Defendant looking into the purchases by the Parks and Recreation Department, but Mayor Jacobs again confirmed that Plaintiff "didn't do anything

wrong" and that he knew "how much money you've saved Knox County" with respect to the purchasing of the boots for the Parks and Recreation employees.

89. On Friday, October 9, 2020, Chief of Staff, Bryan Hair, was informed by his brother, Brad Hair, who was an assistant to Mayor Jacobs, that Brad Hair saw an email from an "anonymous" former employee that was sent to Mayor Jacobs reporting that Bryan Hair "stole" a golf cart from the Parks and Recreation Department, and this email also referenced the purchasing of boots for the employees and also bonuses paid to Plaintiff.

90. Shortly thereafter, on Friday, October 9, 2020, Chief of Staff, Bryan Hair, made the Plaintiff and other employees in the Parks and Recreation Department, including Chuck James, aware of this "anonymous" email from a former employee that his brother discovered was sent to Mayor Jacobs' email.

91. During this conversation on October 9, 2020, Chief of Staff, Bryan Hair, specifically instructed for Plaintiff and Chuck James to "lie" to Mayor Jacobs about the golf cart, by claiming that Hair "had returned the golf cart months earlier" to which James agreed that he would lie for Hair to protect him and, thereafter, James began taking steps to assist Hair with covering his tracks by returning the golf cart back to Defendant.

92. However, during this conversation on October 9, 2020, Plaintiff made it clear to Bryan Hair and Chuck James that he would not lie to the auditors or Mayor Jacobs to protect Hair, and that Plaintiff intended to tell the truth about the fact that Hair had the County's golf cart throughout the entire summer of 2020.

93. Later that evening, after work hours, on October 9, 2020, Bryan Hair called Plaintiff and again instructed him to "at least say that I returned the golf cart months ago" when Plaintiff speaks to Mayor Jacobs and the auditors in the investigation. Plaintiff again stated he would not

15

lie for Hair since it would be wrong and also illegal, and, in response, Hair got very angry with Plaintiff, threatened that "if you don't tell the Mayor my version [of the facts], then I will fire you" and Hair further stated that he "could handle the Mayor, as long as you tell the same story as me."

94. A government supervisor instructing an employee to lie to auditors in connection with the supervisor's misappropriation of public property is in violation of Tennessee law, including but not limited to, Offenses by Supervisors and Employees, Tenn. Code Ann. § 39-16-410.

95. On Monday, October 12, 2020, Mayor Jacobs called Plaintiff into his office for an unscheduled meeting, wherein Jacobs eventually asked Plaintiff the leading question: "Bryan [Hair] only had the golf cart for just a couple of weeks?" which is exactly what Hair previously represented to Mayor Jacobs, to see if Plaintiff would stick with this same false narrative, but Plaintiff refused to lie.

96. At the time of this meeting on October 12, 2020, on information and belief, Mayor Jacobs was already aware of the misappropriation of County property and employees due to Plaintiff previously complaining about the illegal activities on multiple other occasions, including to Human Resources Director, Marcus Kennedy, as well as Finance Director/Deputy Chief of Staff, Chris Caldwell, since they both stated that they would address Plaintiff's complaints with Mayor Jacobs.

97. During this meeting with Mayor Jacobs on October 12, 2020, Plaintiff explained that "as an employee, no one has listened to me" regarding the illegal misappropriation of County property, which is why Plaintiff began raising it directly with Mayor Jacobs, to set the record straight with the truth, by reporting to Mayor Jacobs, to-wit: Hair had used the County golf cart for his own personal benefit for the entire summer of 2020, that Plaintiff had objected to Hair using

the golf cart since it was County property, paid for by taxpayers, but that Hair had threatened Plaintiff that "he would fire me if I went against him," and that the "Director" of Parks and Recreation, Chuck James, was also involved since he arranged for Hair to be able to use the golf cart, and further, that James had also arranged for employees to provide "free" labor for the personal benefit of certain officials and/or employees, while they were on the clock, and that Hair had now "ordered" and "demanded" for Plaintiff to "lie" in connection with the investigation, but that Plaintiff refused to lie and, in fact, Plaintiff made it clear throughout this meeting with Mayor Jacobs that he intended to truthfully report all of this to the investigators, the Tennessee Comptroller as well as Pugh & Associates, including the fact that Plaintiff had previously reported these same concerns about the illegal activities to both Marcus Kennedy and Chris Caldwell.

98. After Plaintiff confirmed that Bryan Hair was lying about his use of the golf cart and that Plaintiff was not going to go along with the false story about how long Hair used the golf cart, Mayor Jacobs became visibly angry and upset, his face turned bright red, and he violently smacked his desk with a closed fist, as he immediately cut the Plaintiff off, told Plaintiff to "shut the f--k up" and Mayor Jacobs further stated that he was "not interested in hearing the truth."

99. Yet, despite Mayor Jacobs' angry response and telling Plaintiff that he was "not interested in hearing the truth," Mayor Jacobs proceeded to ask Plaintiff at least two or three different times during this meeting the same question he asked initially: "Are you *sure* that Bryan [Hair] did not have the golf cart for only a couple of weeks?" which made it clear to Plaintiff that he was trying to lead Plaintiff into lying, by agreeing with Hair's fabricated story of using the golf cart "for only a couple of weeks," since Hair using the golf cart for a shorter period of time would be more easily defendable in the eyes of the auditors, Tennessee Comptroller, and the public.

100. Each time in response to this same question, however, Plaintiff repeatedly stated

that he would not lie to the investigators, including to the Tennessee Comptroller, about Bryan Hair's use of the golf cart or the other illegal activities that Plaintiff raised during this meeting, to which Mayor Jacobs eventually relented, and, while visibly upset and disappointed, he remarked: "I now have to take this to Pugh [& Associates] and the State Comptroller office" and Mayor Jacobs also stated during this conversation, "I have no other choice but to push forward with the investigation" due to Plaintiff insisting on reporting the truth throughout this meeting on October 12, 2020 and also due to Plaintiff expressing his clear intent to likewise truthfully report this same information, the illegal misappropriation of County property and employees, in the subsequent investigation by the Tennessee Comptroller.

101. Near the end of this meeting on October 12, 2020, it was clear that Mayor Jacobs was angry and upset that his Chief of Staff, Bryan Hair, had blatantly lied to him about the use of the County's golf cart, and also that Plaintiff insisted on reporting the truth in the ensuing investigation by the Tennessee Comptroller, as well as Pugh & Associates, and that Plaintiff would not lie or cover-up to protect Hair, and, in turn, Plaintiff also would not lie to protect Defendant and/or Mayor Jacobs from the scrutiny they would face on this matter of public concern.

102. Near the end of this meeting on October 12, 2020, Mayor Jacobs specifically instructed the Plaintiff: "Do not discuss our conversation with anyone, including the public and other employees" and Mayor Jacobs further instructed Plaintiff: "Do not talk to any of the investigators unless or until they contact you."

103. Plaintiff did as he was instructed to do, and therefore did not talk to the public or other employees, and he also did not contact the Tennessee Comptroller office since he was told to wait to be contacted by the investigators.

104. Unbeknownst to Plaintiff, however, Defendant would thereafter use this instruction

not to speak to anyone, essentially amounting to a prior restraint of Plaintiff's free speech rights, against Plaintiff because it gave Defendant time to create a false narrative for the public and the media, the investigators, and the Tennessee Comptroller, to defamatorily blame Plaintiff as one of the employees involved in the fraudulent misappropriation, when this was not true or accurate since Plaintiff complained about and attempted to stop the illegal conduct on multiple prior occasions.

105. After the meeting with Mayor Jacobs on October 12, 2020, later that same day, Chief of Staff, Bryan Hair, informed Plaintiff that he had "heard" Plaintiff was in Mayor Jacobs' office earlier that day, to which Plaintiff confirmed that he was there and that he had also reported the truth to Mayor Jacobs about Hair's illegal misappropriation of the County's golf cart. In response, Hair's tone became angry as he ominously stated: "You should not have done that."

106. During this conversation, Bryan Hair repeatedly echoed the same leading question that Mayor Jacobs asked Plaintiff earlier that day, by suggesting to Plaintiff that "I only had the golf cart 2 weeks, didn't I?" But Plaintiff again stated that was not true and that he refused to lie.

107. In response, Hair again threatened Plaintiff: "Well, that's going to be our truth, or you are going to be fired" and then Hair told Plaintiff: "Do not say how long I had the golf cart to the investigators [*i.e.*, Tennessee Comptroller and Pugh & Associates]." Once again, however, Plaintiff made it clear that he would not lie in connection with the investigation, and that he intended to tell the investigators the truth.

108. After Mayor Jacobs met with Plaintiff on October 12, 2020, later that same day, Mayor Jacobs also met with and/or spoke with the Human Resources Director, Marcus Kennedy.

109. Shortly thereafter, Marcus Kennedy called Plaintiff to assert that "I will help protect you as I know the truth" regarding Plaintiff's complaints about the illegal activities and Plaintiff's

19

concern of retaliation for reporting the truth to Mayor Jacobs, among others, and Kennedy thereafter stated that Mayor Jacobs told him that Plaintiff "wouldn't lie" in connection with the ensuing investigation, to which Plaintiff confirmed that he would not lie.

110. On October 14, 2020, Finance Director/Deputy Chief of Staff, Chris Caldwell, abruptly informed Plaintiff that he was being placed on "paid administrative leave by the Mayor [Jacobs]" due to Bryan Hair's use of the County's golf cart, but that Plaintiff's suspension was only a "technicality because it happened in your Department" and Caldwell reiterated to Plaintiff that "you've done nothing wrong."

111. During the conversation on October 14, 2020, Chris Caldwell also informed Plaintiff that Defendant "started the ball rolling with an investigation by Pugh & Associates, and the [Tennessee] State Comptroller" regarding Bryan Hair's use of the County's golf cart, and Caldwell specifically confirmed that this "investigation" was "based on what you told the Mayor [during their meeting on October 12, 2020]" and "you telling the truth is getting Bryan [Hair] in trouble and is what started all of this" in regards to the investigation.

112. During the conversation on October 14, 2020, Chris Caldwell repeatedly assured Plaintiff that "your job is safe as long as you are honest" in connection with the investigation, and Caldwell further echoed what Mayor Jacobs had instructed Plaintiff a few days prior that Plaintiff was specifically told "not to speak to anyone about this, including the investigators unless you are spoken to" in the investigation by Pugh & Associates and the Tennessee Comptroller.

113. Plaintiff again confirmed that he would do as instructed by Mayor Jacobs and Chris Caldwell—by not speaking to anyone about the complained of illegal activities, and also that Plaintiff would not reach out to the Tennessee Comptroller in regards to same—but, unfortunately, Plaintiff did not know that Defendant would use this against Plaintiff, which was essentially prior

restraint of Plaintiff's free speech rights, to thereafter create a false narrative asserting that Plaintiff was involved in the same illegal activities that he had complained about previously on several different occasions, to different senior officials, but his complaints were repeatedly ignored.

114. From that point, forward, Plaintiff eagerly waited to be contacted by the Tennessee Comptroller and Pugh & Associates to explain the whole truth about the misappropriation of County property and employees.

115. However, Defendant was well-aware of this fact, and in an effort to conceal the truth and place the blame on Plaintiff, Defendant went on the offensive to prevent Plaintiff from reporting the truth to anyone, including in the subsequent "investigation," by proactively taking steps to use Plaintiff as a scapegoat for the illegal and unethical conduct, as hereinafter alleged, by either misrepresenting and/or selectively reporting conduct to defame Plaintiff and place him in a false light in the eyes of the public and the investigators, including the Tennessee Comptroller, as hereinafter alleged.

116. In that regard, in October 2020, the "Director" of the Parks and Recreation Department, Chuck James, began meeting with other employees in Parks and Recreation to instruct them on what they should say in the investigation of the illegal misappropriation of County property and employees that performed work, while still on the clock, for the personal gain and benefit of others.

117. For example, on or about October 16, 2020, Chuck James met with Parks and Recreation employee, Joe Inman, after work hours to specifically instruct Inman lie to the investigators about the work that Inman and other employees performed at the private residences of certain employees, while still on the clock, and James further stated that "you and Mike [Edsell] will need to get your stories straight and get with Chief [of Staff, Bryan Hair], and don't use the

21

phones, don't use anything, but it shouldn't be a big deal if ya'll weren't on the clock." However, this was not true, and, in fact, the Defendant instructing its employees to blatantly lie and mislead investigators is in clear violation of Tennessee law.

118. After Plaintiff was placed on administrative leave, on October 14, 2020, he heard nothing further about the alleged "investigation" or from Defendant until around 9:30 P.M. on Sunday, October 18, 2020, when he received a late-night call from Human Resources Director, Marcus Kennedy.

119. At the time that Marcus Kennedy called Plaintiff on Sunday, October 18, 2020 around 9:30 P.M., Kennedy was in a very loud restaurant or bar with other employees present, including Mike Donila, Abby Harris, and Chris Caldwell.

120. In an unprecedented turn-of-events, Marcus Kennedy began using a very aggressive tone during this call as he abruptly informed Plaintiff that "the Mayor wants your immediate resignation" and that Kennedy was calling to "request" Plaintiff's resignation.

121. However, Plaintiff explained that he would not resign since he had done nothing wrong, and that he was looking forward to the investigation to report what actually happened with respect to the misappropriation of County property and employees, and how Plaintiff had already attempted to stop it previously by reporting the conduct to multiple high-level officials, including, Marcus Kennedy, among others.

122. In response to Plaintiff's refusal to resign, however, Marcus Kennedy became increasingly angry, began yelling and cursing at Plaintiff for refusing to resign—Kennedy repeatedly called Plaintiff a "stupid motherf--ker" among other derogatory expletives—and this eventually resulted in Kennedy blatantly threatening that "you will resign immediately or else the Mayor and I will get the [Tennessee] Comptroller, who we know, to interview you and we will

make your life miserable and you will be prosecuted and get jail time" and "make sure you never have a job again."

123. This clear attempt to extort Plaintiff's "voluntary" resignation understandably intimidated him, but Plaintiff held his ground and repeatedly explained that he would not resign because he had done nothing wrong, to which Marcus Kennedy responded, "you have two f--king minutes to make a decision and that you better resign or I will fire you for insubordination." Plaintiff then pleaded for more time to consider the options, and, at the very least, to be able to talk to his fiancée to help process Mayor Jacobs' abrupt demand for Plaintiff's resignation, and Kennedy eventually agreed to give Plaintiff "a few minutes to talk it over."

124. Approximately fifteen (15) minutes later, around 10:00 P.M. on Sunday, October 18, 2020, Marcus Kennedy called Plaintiff back to again "request" his resignation and, to Kennedy's dismay, Plaintiff again refused to resign since he had done nothing wrong and, in fact, attempted on several occasions to get Bryan Hair to cease the misappropriation of County property and employees, including by raising such complaints to Kennedy directly, and Kennedy was well-aware of this fact.

125. At the end of this second conversation on October 18, 2020, Marcus Kennedy informed Plaintiff that he had until 10:00 A.M. the following morning, October 19, 2020, to "consider" whether Plaintiff would agree to resign his employment.

126. The following day, October 19, 2020, at 9:30 A.M., Marcus Kennedy called Plaintiff to again "request" for Plaintiff's resignation, but, once again, Plaintiff refused to resign. In response, Kennedy became furious and began screaming: "I AM TRYING TO HELP YOU OUT AND YOU BETTER RESIGN." But Plaintiff again explained that he would not resign, since he had done nothing wrong, which resulted in Kennedy immediately hanging up the phone

23

on Plaintiff.

127. It was not until later that same day, October 19, 2020, that Plaintiff learned that he had been fired by Defendant according to a news alert, which was apparently based on one of Defendant's press releases announcing that Defendant had "dismissed" Plaintiff and insinuating that Plaintiff was involved in the wrongdoing. (*See* Defendant's Press Release, dated October 19, 2020, attached hereto as Exhibit 1).

128. In fact, much to Plaintiff's humiliation and embarrassment, his own son was the one who informed Plaintiff of his termination after seeing the news alert posted on social media.

129. The press release dated October 19, 2020 (Exh. 1) was issued at the direction and/or permission of Mayor Jacobs.

130. On information and belief, the Defendant published, distributed, and/or otherwise made available to the general public, including the media and other third parties, the press release dated October 19, 2020 (Exh. 1) and/or Defendant published substantially similar statements as contained therein on and after October 19, 2020.

131. The manner in which Defendant reported and commented on the termination of Plaintiff, including but not limited to, via Defendant's press release dated October 19, 2020 (Exh. 1), was defamatory and cast Plaintiff in a false light because, as Defendant announced that it "dismissed" Plaintiff, it further remarked that the Tennessee Comptroller's Office "accepted" Mayor Jacobs' "request to look into the allegations of wrongdoing" and Mayor Jacobs also remarked that "Ethics are not ambiguous…." (*See* Exh. 1).

132. Similarly, shortly after Plaintiff was placed on administrative leave on October 14, 2020, Defendant issued a press release claiming that Plaintiff and Chief of Staff, Bryan Hair, were both placed on administrative leave after Mayor Jacobs "was made aware of potential wrongdoing"

and that an "investigation could take several weeks." (Defendant's Press Release dated October 15, 2020, attached hereto as Exhibit 2).

133. Yet, before or after his termination on October 19, 2020, Plaintiff was never interviewed or even questioned in connection with any such "investigation" because Defendant did not want Plaintiff to report the truth, nor for Plaintiff to be able to clear his name in connection with the investigation.

134. The press release dated October 15, 2020 (Exh. 2) was issued at the direction and/or permission of Mayor Jacobs.

135. On information and belief, the Defendant published, distributed, and/or otherwise made available to the general public, including the media and other third parties, the press release dated October 15, 2020 (Exh. 2) and/or Defendant published substantially similar statements as contained therein on and after October 14, 2020.

136. Prior to Plaintiff's termination on October 19, 2020, Defendant never directly informed Plaintiff that he was terminated, and Defendant never provided Plaintiff with any paperwork confirming Plaintiff's termination in writing.

137. Prior to Plaintiff's termination on October 19, 2020, Defendant never interviewed Plaintiff in connection with any investigation, and otherwise never allowed Plaintiff to tell his side of the story.

138. Prior to Plaintiff's termination on October 19, 2020, he was never interviewed by any of Defendant's designated "investigators" which consisted of Marcus Kennedy, Dwight Van de Vate, Chris Caldwell, Abbey Harris, and Mike Donila.

139. Yet, most, if not all, of Defendant's above-referenced designated "investigators" were already aware of Bryan Hair's misappropriation of County property and employees for his

own personal gain and benefit—because Plaintiff specifically made them aware of this conduct before his termination—but Defendant's did not take any corrective action in response to Plaintiff's complaints, that is, until after Plaintiff was suspended and then they used Plaintiff as a scapegoat in the subsequent investigation to terminate Plaintiff.

140. Further, on information and belief, there was never any real investigation into the conduct or involvement of Chuck James, such as for authorizing Bryan Hair's use of the County's property, ensuring the "free" delivery of the golf cart to Hair's private residence, and also James' involvement in having employees perform work, while on the clock, at the private residences of Defendant's officials and/or other employees, and/or their friends or family, all of which was at the expense of Knox County taxpayers.

141. Prior to Plaintiff's termination on October 19, 2020, Defendant's standard policy, procedure, and custom was to hold a meeting with the person(s) that are the subject of an investigation and/or disciplinary decision, to at least get their side of the story, but Plaintiff was never afforded any such opportunity to clear his name or chance to respond to the allegations against him.

142. On October 19, 2020, the Chief of Staff, Bryan Hair, tendered his resignation, thereby terminating his employment.

143. On or before October 19, 2020, on information and belief, Mayor Jacobs requested for Bryan Hair to tender the resignation of his employment.

144. At all times material hereto, Defendant did not conduct any legitimate investigation into the illegal activities that Plaintiff reported, opposed, and refused to remain silent about, and, instead, Defendant made the decision to actively cover-up Plaintiff's complaints, and then used Plaintiff as a scapegoat in connection with the ensuing investigation, to blame him in the eyes of

the public and press, and otherwise defame Plaintiff and place him in a false light, to embarrass and humiliate him, and ruin his reputation.

145. At the time Plaintiff raised his concerns about the illegal and unethical conduct, and confirmed his intention with Defendant to truthfully report the illegal conduct to the investigators, including the Tennessee Comptroller, as described herein, Plaintiff was not acting within the scope of his job responsibilities but, rather, Plaintiff was speaking as a private citizen about matters of great public concern.

146. A government official's misappropriation of County property for their own personal gain and benefit is a matter of great public concern.

147. A government official's misappropriation of County employees to use as free labor for their own personal gain and benefit is a matter of great public concern.

148. Prior to his termination, Plaintiff exposed in good faith what he believed to be illegal and unethical conduct by local government officials, including the blatant misappropriation of County property and employees, at the expense of Knox County taxpayers, and Plaintiff reported his concerns about the illegal and unethical conduct to high-ranking officials throughout Defendant's government, including Mayor Jacobs, and also confirmed his intention to truthfully report the same to the investigators, including the Tennessee Comptroller, out of concern as a private citizen for the public's health, welfare, and safety, as well as to bring forward the violations of Tennessee and federal law, and to expose corruption.

149. After Plaintiff's complaints, as described herein, Plaintiff was increasingly cut off from the management team, ostracized, and he otherwise had only limited interaction with Mayor Jacobs, Chief of Staff, Bryan Hair, and others, up until the time of his termination.

150. Mayor Jacobs made the decision and/or was involved in the decision-making

process to terminate the Plaintiff on October 19, 2020.

151. In attempting to extort Plaintiff's "voluntary" resignation, and thereafter terminating Plaintiff, Mayor Jacobs and Marcus Kennedy were acting under color of the law pursuant to their respective governmental duties and powers, and there was no further appeal of the termination decision.

152. In making the decision to terminate Plaintiff, Mayor Jacobs intentionally deprived Plaintiff of his constitutional rights of which he, and objectively reasonable persons in his position, would have known and such condition was unreasonable in light of those clearly established rights.

153. As the Mayor of Defendant, Glenn Jacobs acted pursuant to official policies of Defendant in that Mayor Jacobs had final policy-making authority with respect to Plaintiff's termination.

154. Mayor Jacobs' decision to terminate the Plaintiff was unreviewable.

155. Plaintiff was never directly given a reason for his termination on October 19, 2020, other than Defendant placing Plaintiff in a defamatory and false light by issuing press releases and statements which indicated that Plaintiff was fired because he was involved in the misappropriation of government property and employees, and/or was a facilitator of Bryan Hair's misappropriation of government property and employees, thereby using Plaintiff as a de facto scapegoat within Defendant's Parks and Recreation Department, and also that Plaintiff was the subject of the Tennessee Comptroller investigation due to Plaintiff's alleged inappropriate and/or alleged unethical conduct.

156. Plaintiff was fired for a trumped-up reason, and the real reason for his termination violates both Federal and Tennessee law, as herein alleged.

157. Further, leading up to and after Plaintiff's termination, Defendant also began to take

steps to make good on the threats that Mayor Jacobs and Human Resources Director, Marcus Kennedy, made to Plaintiff since he repeatedly refused to tender his resignation, in that Kennedy threatened he and Mayor Jacobs "will get the Comptroller, who we know, to interview you and we will make your life miserable and you will be prosecuted and get jail time."

158. In that regard, after Plaintiff's termination in late-2020, much to Plaintiff's shock and dismay, and to add further insult to injury, Plaintiff was thereafter contacted by the Tennessee Comptroller requesting to "interview" Plaintiff with its investigation.

159. At that point in late-2020, on information and belief, Defendant had already provided false, inaccurate, and defamatory information to the Tennessee Comptroller about Plaintiff, such as what Plaintiff supposedly did or knew, including by either misrepresenting the truth and/or by selectively reporting information concerning Plaintiff, in order to protect other employees actually involved in the illegal activities, in the attempt to turn the focus of the Tennessee Comptroller's investigation onto Plaintiff as well as Bryan Hair, and away from Defendant's other officials and employees who were allowed to keep their jobs, despite engaging in the exact same or worse conduct than Plaintiff was being falsely accused of.

160. The information that Defendant provided to the Tennessee Comptroller regarding Plaintiff was at the direction of Mayor Jacobs, and/or Mayor Jacobs was involved in the decision-making process thereof while acting under color of law.

161. Plaintiff had a constitutionally protected property interest in continued employment, and also a constitutionally protected liberty interest in his reputation, good name, honor, and integrity, all of which could not be deprived of these rights without due process.

162. Defendant deprived Plaintiff of his rights to due process pursuant to a governmental custom, policy, ordinance, regulation, and/or decision and while acting under color of law,

including to at least interview Plaintiff to be able to respond to the allegations against him and tell his side of the story.

163. In terminating the Plaintiff, Defendant was acting under color of the law pursuant to their governmental duties and powers.

164. Mayor Jacobs controlled the terms and conditions of Plaintiff's employment, had the authority to discharge Plaintiff and influence his discharge, made the decision to discharge him, and acted as the final decision-maker.

165. As the Mayor, Glenn Jacobs acted pursuant to official policies and customs of Defendant and he had final policy-making authority on behalf of Defendant, and he abused his authority under color of law while purporting to act pursuant to his official duties in subjecting Plaintiff to unlawful conduct, and depriving him of his rights to due process.

166. Defendant and Mayor Jacobs knew or should have reasonably known that Defendant engaged in acts that deprived Plaintiff of his rights to due process and failed to act to prevent it, or correction the violations of his due process rights.

167. Defendant is responsible and liable for the retaliatory actions of its agents and employees under the doctrine of *respondent superior* and under agency principles, and further, Defendant is responsible and liable because the decision-maker(s) to Plaintiff's termination had final policy-making authority with respect to the termination decision.

168. This suit is timely filed.

169. As a result of Defendant's conduct, the Plaintiff has sustained, and will sustain, great humiliation, embarrassment, emotional distress and anxiety, damage to his professional reputation and standing in the community, and loss of enjoyment of life, and Plaintiff has further lost tangible job benefits, including a loss of income and other privileges and benefits of

employment, both past and future.

**COUNT I**

**VIOLATION OF 42 U.S.C. § 1983
FIRST AMENDMENT RETALIATION**

170. The foregoing allegations are incorporated herein by reference to same.

171. As set forth above, Defendant deprived Plaintiff of the rights secured by the United States Constitution while acting under color of state law.

172. Plaintiff engaged in constitutionally protected speech activity on matters of public concern, and made it clear that he intended to further engage in constitutionally protected speech in the future, such as in the Tennessee Comptroller's investigation, and his interest in such activity outweighs Defendant's interest in promoting the efficiency of the public service it provides as an employer.

173. Plaintiff's speech activity did not and would not disrupt the workplace and Defendant has no legitimate competing interest in prohibiting it for the Court to balance.

174. Plaintiff suffered adverse employment actions, as described above, that would chill an ordinary person in the exercise of his constitutional rights.

175. Plaintiff's speech activity was a substantial or motivating factor in the adverse actions he suffered, in violation of 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

176. Defendant's conduct was undertaken with malice and/or reckless indifference for or indifference to Plaintiff's federally protected rights.

177. As set forth above, Defendant's conduct harmed and caused damages to Plaintiff.

**COUNT II**

**VIOLATION OF TENNESSEE PUBLIC PROTECTION ACT**

178. The foregoing allegations are incorporated herein by reference to same.

179. As set forth above, Defendant terminated Plaintiff's employment because he exercised his constitutional and statutory rights and refused to remain silent about or participate in conduct that violated, or that he reasonably believed violated the laws, regulations, codes and ordinances intended to protect the public health, safety, and welfare.

180. Defendant terminated Plaintiff's employment constitutes a violation of public policy and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

181. Defendant's conduct was intentional, reckless, malicious, and/or fraudulent.

## COUNT III

### VIOLATION OF TENNESSEE PUBLIC EMPLOYEE POLITICAL FREEDOM ACT
### TENN. CODE ANN. § 8-50-603

182. The foregoing allegations are incorporated herein by reference to same.

183. As set forth above, after Plaintiff's reports of the illegal and unethical conduct that he reasonably believed violated the laws, regulations, codes and ordinances intended to protect the public health, safety, and welfare, were continually ignored and dismissed until Plaintiff eventually raised his complaints directly to Defendant's highest elected public official, Mayor Glenn Jacobs, including on October 12, 2020, wherein Plaintiff confirmed that he would not lie in connection with the ensuing investigation into the areas of illegal activity taking place within Defendant's government.

184. At the time of Plaintiff's communications to Mayor Jacobs, including but not limited to, on October 12, 2020, Mayor Jacobs was the Defendant's highest elected public official.

185. However, in response, Mayor Jacobs became angry with Plaintiff, told him to "shut the f--k up," and Jacobs and other high-level senior officials who were thereafter made aware of

Plaintiff's communications to Mayor Jacobs, including Marcus Kennedy and Bryan Hair, threatened Plaintiff's future employment with Defendant resulting in additional retaliatory conduct against Plaintiff, including instructing other employees to lie to investigators in order to the blame Plaintiff.

186. Ultimately, Plaintiff was suspended and then terminated nearly one week after he communicated his complaints directly to Mayor Jacobs on October 12, 2020.

187. Therefore, as an additional cause of action and/or in the alternative to the other claims set forth herein, Plaintiff was wrongfully disciplined, threatened with discipline, terminated, and otherwise discriminated against for exercising his right to communicate with an elected public official, Mayor Jacobs, in violation of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603.

188. Thus, Plaintiff is entitled to the following relief provided by the anti-discrimination/retaliation provision of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603, including treble damages, plus reasonable attorneys' fees.

<u>COUNT IV</u>

**VIOLATION OF TENNESSEE FALSE CLAIMS ACT**
**TENN. CODE ANN. § 4-18-105(C)**

189. The foregoing allegations are incorporated herein by reference to same.

190. As set forth above, after Plaintiff discovered that Defendant's Chief of Staff, Bryan Hair, and others, were fraudulently misappropriating Defendant's property and employee labor for their own personal gain and benefit, Plaintiff began taking steps in the attempt to stop their fraudulent conduct, and Plaintiff further repeatedly affirmed that he would not lie to the investigators, Tennessee Comptroller, in connection with the ensuing investigation.

191. Plaintiff's reports and other attempts to stop the fraudulent misappropriation of

Defendant's property and employee labor, including Plaintiff repeatedly confirming his intent to participate and assist in the Tennessee Comptroller's investigation by providing truthful information, were protected activities under the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101, *et seq.*

192. Immediately after Plaintiff engaged in the protected activities, as set forth herein, Defendant retaliated against Plaintiff, including by, but not limited to, abruptly placing Plaintiff on administrative leave, ostracizing and isolating Plaintiff, attempting to coerce Plaintiff's "voluntary" resignation, threatening Plaintiff with termination, and otherwise discriminating against Plaintiff, ultimately leading to Defendant terminating Plaintiff on October 19, 2020, all of which is in violation of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-105(c).

193. Thus, Plaintiff is entitled to the following relief provided by the anti-discrimination/retaliation provision of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-105(c), including reinstatement with the same seniority status, two (2) times the amount of back pay, interest on the back pay, compensation for any special damages sustained as a result of the discrimination/retaliation, and appropriate punitive damages, in addition to litigation costs and reasonable attorneys' fees.

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

1. Compensatory damages, including back pay and front pay, (or, in the alternative, reinstatement, if the Court deems it appropriate).

2. Treble damages.

3. Two times the amount of backpay with interest.

4. Appropriate punitive damages.

5. Prejudgment interest.

6.     Reasonable attorney's fees

7.     The costs of this action.

8.     A jury to try this cause.

9.     Appropriate injunctive relief ordering Defendant to cease and desist from engaging in discriminatory and retaliatory acts, illegal and unethical conduct as public officials, and to undergo training as appropriate.

RESPECTFULLY SUBMITTED, this the 18th day of October, 2021.

**THE BURKHALTER LAW FIRM, P.C.**

s/David A. Burkhalter, II
David A. Burkhalter II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974